CHARLOTTE OIL & FERTILIZER CO. v. HARTOG et al.

(Circuit Court of Appeals, Fourth Circuit.   February 1, 1898.)

No. 234.

1. FACTORS—HOLDING CONSIGNMENT—FAILURE TO USE DILIGENCE.
   A factor who has advised the sale of a consignment of meal, and has informed the consignor of the weak condition of the market, by holding the consignment in accordance with the directions of the consignor, does not become liable for failure to use diligence, merely because he afterwards sells the same on a low market.

2. CUSTOMS AND USAGES—FACTORS—DISAFFIRMANCE OF CONTRACT.
   One who consigns merchandise to a factor at a foreign port cannot hold the factor responsible for the cancellation of a contract of sale by a purchaser as permitted by the custom of that port, even though the custom seems unreasonable.

3. ACCOUNT STATED—ESTOPPEL.
   The silence of one to whom an account has been rendered does not estop him from attacking it by showing fraud, omission, or mistake.

4. ACCOUNT STATED—FACTOR.
   When an account sales of a consignment was rendered by a factor, and the consignor thereupon drew on the factor for "balance due on account. sales," and the draft was honored, in the absence of fraud, omission, or mistake, the account becomes stated and settled.

In Error to the Circuit Court of the United States for the Western. District of North Carolina.

This was an action on account by Hartog & Fesel against the Charlotte Oil & Fertilizer Company. Defendant filed a counterclaim. Judgment was rendered for plaintiffs, and defendant brings error.

Platt D. Walker, for plaintiff in error.

Charles W. Tillett, for defendants in error.

Before GOFF, Circuit Judge, and BRAWLEY and PURNELL, District Judges.

BRAWLEY, District Judge. The defendants in error, who were plaintiffs below, were commission merchants at Rotterdam, in the kingdom of the Netherlands, and this controversy grows out of sundry shipments of cotton-seed meal and cotton-seed oil made by the plaintiff in error, the defendant below, a corporation, doing business at Charlotte, N. C. The first shipment was of oil, account sales of which were sent on January 28, 1893, subsequently closed by draft, and does not enter into this controversy. The second shipment was of 1,700 tons of cotton-seed meal, originally consigned to Eitzen & Co., at Hamburg, but subsequently transferred, for reasons stated, to Hartog & Fesel, who accepted and paid a draft for 140,000 marks drawn on account thereof on February 3, 1893. The third shipment was of 2,000 barrels of cotton-seed oil by the steamship Persian Prince, against which a draft of 125,000 marks was drawn and accepted and paid by Hartog & Fesel prior to March 7, 1893. The fourth shipment was of 1,000 barrels of cotton-seed oil shipped on steamship Grecian Prince, March 24, 1893, against which a draft of 60,000 marks was drawn and paid on April 4, 1893. Account sales of the second and third consignments was rendered on June 10, 1893, showing a balance due the oil company of 10,681.74 marks, which drew on June 16, 1893, a draft for 10,600 marks "as balance due on account sales meal and 2,000 barrels oil." Account sales of the fourth consignment was rendered December 20, 1893, showing a balance due Hartog & Fesel of 10,460.67 marks, and a draft for that amount, being the equivalent of $4,269.66 in the currency of the United States, was drawn by them, and, payment being refused, suit was brought to recover the same; and a verdict in favor of the plaintiffs for that sum, with interest, having been rendered on April 4, 1897, and a judgment thereon duly entered, the cause is before us by writ of error on a bill of exceptions.

Numerous exceptions were taken during the trial, but a proper understanding of the points considered in the court below, and upon which our decision rests, does not require that they be considered in detail. The main question is whether the account sales of consignments No. 2 and No. 3 is to be considered as an account stated and settled, and arises upon the counterclaim interposed by the defendant below in its answer to the complaint of the plaintiffs, which was for the balance due on consignment No. 4.

The testimony shows that Hartog & Fesel was an old and well established firm of commission merchants at Rotterdam, and that the individual members of it were active and reputable; and that Oliver, the president of the oil company, who conducted the correspondence, and business relating to these transactions, was an intelligent and alert

man of business, who kept himself well informed as to the markets of the world. It may be fairly inferred from the testimony that Hartog & Fesel were cautious and conservative, and that Oliver believed himself to be more thoroughly informed as to the condition of the market for cotton-seed oil and meal at home and abroad than his factors were, and therefore disposed to act upon his own judgment and to take risks. The first item in the counterclaim relates to consignment No. 2,—the cotton-seed meal,—and charges that the plaintiffs did not use diligence in selling the same, but unreasonably delayed doing so, by reason wherof the defendant suffered a loss of over $6,000. The correspondence, by cable and letter, clearly shows that the delay in selling the meal was due to Oliver himself; that the plaintiffs were entirely faithful to their obligation to keep him informed as to the conditions affecting the market in Holland, and were urging a sale, while Oliver, believing himself to be better informed as to general conditions, restrained them from selling. In his letter of February 7, 1893, he says: "We are just so confident that there is money to be made in holding the meal now in Hamburg that we would be very likely to buy all the meal in Hamburg at present prices and corner the market, for there will not be any more meal exported;" and, after stating certain facts tending to confirm his views, adds: "As the meal is now in store, we do not want it offered below 135 marks, and don't care to sell at this price at present. We prefer to have the meal taken entirely off the market, and will advise you when to sell." And in reply to the message from Hartog on March 20, advising that "prices continue the downward course. Please authorize us to sell at best we can,"—he answers "Do not force the market; we shall see prices higher this season." All of the correspondence is of like tenor.

The second item in the counterclaim relates to consignment No. 3,—the 2,000 barrels of oil shipped on the Persian Prince in February, 1893. Oliver wired on the 24th, asking the best offer for the oil to be sold in transit, to which Hartog & Fesel replied on same day that they could probably sell at fl. 47. On 27th Oliver authorized a sale at that price, and, on March 3d, Hartog & Fesel wired that they had sold, to arrive, 2,000 barrels, at fl. 47. The Persian Prince arrived at Rotterdam about the end of March, and on April 1st Hartog & Fesel cabled that the buyers refused to receive it, on the ground that it was not satisfactory, although they (H. & F.) could find no fault with it. Oil, meantime, had declined in price, and much correspondence ensued, in which Oliver insisted that the buyers should be held to their contract, offering, if necessary, to submit the matter to arbitration. In the course of the correspondence, Hartog & Fesel explained that it was the custom of the port at Rotterdam, with respect to cotton-seed oil, that the buyer is entitled to take a few barrels as samples and convert the same into butterine, for which such oil is used, and, if the quality and color does not suit him, he is free to cancel the purchase, and cannot be compelled to take it. Oliver naturally complained of such custom as being one-sided, in that it gave the buyer opportunity to avoid his contract.

The case is not before us in such aspect as requires a consideration or vindication of the reasonableness of the custom. The testimony

clearly shows that such a custom prevails at Rotterdam, and the general law is that the usage of a particular business is impliedly incorporated into every contract of agency, and that a person who employs an agent to do business for him at a particular place must be taken to have contracted according to the custom of that place. If, under the circumstances, the agent acts in good faith, keeps his principal well informed, and gives to his service the intelligence and zeal commensurate with the requirements of the occasion, he cannot be held responsible for not exacting that which he is powerless to enforce. And that is the point next to be considered.

On April the 6th, after being notified of the refusal of the buyers to take the oil at fl. 47, Oliver cabled: "Sell at current market price Persian Prince oil. If a lawful claim, sue first buyer for difference. You may compromise, if cannot enforce,"—to which Hartog & Fesel replied on April 7th: "We cannot enforce. Buyers always entitled rejecting if quality do not suit them. We write you full particulars." After informing them that oil of the "Sherman" brand had been sold that day at f. 35, they say that we have sold 2,000 tierces Persian Prince at f. 35; to which Oliver replied, on the next day, directing a cancellation of the sale, and the storing of the goods, and that formal notice be given to the first buyer that he would be held responsible, adding: "If necessary, we will send our representative, who will most likely arrive by 20th day of April." To this Hartog & Fesel replied, on April 8th, that the sale had been canceled as directed; that, for reasons already stated, they could not give formal notice to hold the buyers responsible; that it was useless to send a representative, as their interests were being looked after; and asking them to await the explanation sent by letter. On April 11th the following letter was written:

"Charlotte, N. C., April 11th, 1893.

"Messrs. Hartog & Fesel, Rotterdam, Holland—Gentlemen: This will introduce to you Mr. Charles H. Fisher, representing the Charlotte Oil and Fertilizer Company of Charlotte, N. C., U. S. A., and also the Gate City Oil Company of Atlanta, Ga., U. S. A. Mr. Fisher is making a business trip in the interest of the two companies, and any courtesy that you may show him will be appreciated. The special object of his trip is to become thoroughly posted as regards the customs of reliable business firms in Holland and Germany, to learn the laws of each country regarding contracts, of purchases and sales. Our recent experience compels us to resort to this trip of investigation in order to be fully posted as to our rights, with the view of continuing export business. He is authorized by the president of this company to attend to any business pertaining to said company, and his acts regarding such business will be recognized by us.

"Yours, truly,                    Charlotte Oil & Fertilizer Company,
                                   "By Fred. Oliver, Pres. and Treas."

Fisher, the bearer of this letter, arrived in Rotterdam about May 1, 1893, and remained until about the end of June. The testimony shows that he was cordially received by Hartog & Fesel; that he was in their office nearly every day; and that he had abundant opportunity to become fully cognizant of all the transactions relating to these consignments, and of the methods of business and usages of the port of Rotterdam, as he was in contact with the dealers in oil at that place. On May the 6th, Hartog & Fesel write to the oil company advising it of Fisher's arrival, and saying:

"We are glad to say we have made the acquaintance with as a thoroughly straightforward and reliable gentleman. Hence we have done the very best we know how to please him and to show him any possible courtesy, and have talked business matters over with him, and especially the question of the rejected 2,000 barrels of cotton-seed oil. We have seen the different buyers with Mr. Fisher, and he has been able to hear from all of them the conditions on which the sale of oil to arrive are made here, and no doubt he has understood the matter fully, and written and cabled you about it. We have no doubt but that his visit and stay here will result in a still more pleasant and paying business for both of us in the future, and we had opportunity to talk to Mr. Fisher about the trade in general, its peculiarities and its difficulties here, just as well as about the advantages there are in sending consignments regularly to this market, and the disadvantages of not doing so, and no doubt he will have explained to you everything fully, so that we need not go into details. Meanwhile we have succeeded in selling for you 1,541 barrels of cotton seed oil at f. 40, and Mr. F. will have explained you all about it. Also, that during summer very little oil is used here, and that, therefore, churners are not in a hurry to buy oil. The fact, however, that oil made by the Kentucky Refinery has been rejected on account of the very inferior quality, made churners awake, and make them take care that their rivals did not buy all the good oil away and left them that were holding off in the cold. We took advantage of this, and sold a part of your oil, and such, after having thoroughly talked the matter over with Mr. F. We will see what can be done with the remainder. Meanwhile a lot of Southern oil was sold at f. 41, but it was to a man who would rather starve than work anything else but Southern, and, besides that, you must not forget that your brand is a new one in the market, for which we want to cultivate our buyers, whilst Southern is an old-established brand. We have nothing to add to all the above said, as Mr. F. can no doubt tell you shorter and plainer than we can how our market lays, and so on. We beg to inclose the advice of sales, and remain," etc.

Three hundred barrels had been previously sold by Oliver's direction at fl. 39. One of the members of the firm testifies in his deposition that Fisher was almost daily in their office during his stay in Rotterdam, and was cognizant of all the transactions in regard to defendant's consignment, and that it was by his direction that 300 barrels of consignment No. 4 was put with consignment No. 3, so that this consignment should be closed out.

Fisher was examined as a witness upon the trial, and did not, in any way, contradict this testimony, or say anything that would controvert the inference fairly deducible from the correspondence and testimony that he was fully informed as to everything connected with these transactions. We must assume, therefore, that when the account was stated and submitted to him on June 10, 1893, he had all the information necessary to an understanding of its correctness. The greater part of consignment No. 3 was sold during the time when Fisher was at Rotterdam, and the accounts were made up and submitted to him. He cabled to the oil company, and on June 16th it sent the following message: "As per cable received to-day from Mr. Fisher, we have made draft on you three days sight for 10,600 florins, as balance due on account sales meal and two thousand barrels of oil."

After Fisher's return to Charlotte, and after the oil company had received the account for consignments No. 2 and No. 3, it appears that the oil company desired to make another consignment of 1,150 barrels of oil, but, owing to disagreement between the parties as to the terms of advancements, this consignment was not made. The testimony shows that there was a correspondence between the parties until the

end of the year. It nowhere appears that any question was made as to the correctness of this account, and not until suit was commenced to recover the balance claimed by Hartog & Fesel on consignment No. 4 were they advised that the account was disputed, and this was by counterclaim set up in the answer, as hereinbefore related. Waiving the determination of whether in this action such a counterclaim could be properly pleaded, the weight and effect of the account stated on June 10, 1893, is next to be considered.

The mere rendering of an account does not, of itself, make it a stated one. It may become so by the silence of the party receiving it, and long acquiescence may raise an implication of law that the party admits its correctness; the underlying principle being that the silence of the party to whom the account is sent warrants the inference of an admission of its correctness, which inference is more or less strong, according to circumstances. "Between merchants at home, an account which has been presented, and no objection made thereto, after the lapse of several posts, is treated, under ordinary circumstances, as being, by acquiescence, a stated account." Story, Eq. Jur. § 526. When the facts are clear it is always a question of law whether a party is concluded by the admission implied from his silence, but he is not estopped from proving fraud, omission, or mistake. Toland v. Sprague, 12 Pet. 300; Wiggins v. Burkham, 10 Wall. 129; Oil Co. v. Van Etten, 107 U. S. 326, 1 Sup. Ct. 178. The law does not favor the claim of those whose silence gives assurance of acquiescence in a given state of things, or who, after the knowledge of the committal of an unauthorized act, fail to actively condemn or seek judicial redress therefor. The cases in which these principles have been applied are very numerous, and the circumstances which the law endows with the power of creating obligations, or effecting estoppels, are of such variety that it will not be profitable to do more than cite a few of them. In Chappedelaine v. Dechenaux, 4 Cranch, 309, Chief Justice Marshall says: "No practice could be more dangerous than that of opening accounts, which the parties themselves have adjusted, on suggestion supported by doubtful or by only probable testimony. The whole labor of proof lies upon the party objecting to the account, and errors which he does not plainly establish cannot be supposed to exist." Manufacturing Co. v. Starke, 4 Mason, 296, Fed. Cas. No. 11,802; Meyer v. Morgan, 24 Am. Rep. 617; Cairnes v. Lord Bleecker, 12 Johns. 304; Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657; Bessent v. Harris, 63 N. C. 542; Suttle v. Doggett, 87 N. C. 205.

We have examined the numerous cases cited by the learned counsel for the plaintiff in error, such as Lockwood v. Thorne, 18 N. Y. 285, Wittich v. Allison, 6 C. C. A. 135, 56 Fed. 796, and Baxter v. Lockett (Wash.) 6 Pac. 429, wherein most of the leading cases on the subject are reviewed. These cases are cited in support of the view that a stated account is, at most, a mere admission that the account is correct, and that its effect is to establish prima facie the accuracy of the items, without other proof. These cases would be in point, if it were contended that a mere stated account created an estoppel. We do not so hold, for all the authorities agree that it is open to impeachment for fraud or mistake. The force and effect of the implied admission of the

correctness of an account stated, and the strength of evidence necessary to overcome it, must always depend upon the circumstances of each case. In this case we have not merely an account stated. It is an account stated and settled. When Hartog & Fesel prepared the statement of the account for consignments No. 2 and No. 3, on June 10, 1893, and submitted the same to Fisher, the agent of the oil company, it was manifestly their intention to make a final settlement as to those consignments; and it is equally clear that when the oil company drew its draft for 10,600 marks on June 16th, "as balance due on account of sales of meal and 2,000 barrels of oil," both parties considered this account as closed. The fact that there was a fractional balance left undrawn does not, under the circumstances, make any difference. This settlement is binding upon the parties as to all reciprocal demands then existing; certainly as to all known demands. What would be its effect as to claims not then discovered need not be considered, as none such appear; for the counterclaims have their origin in transactions anterior to the settlement, lay dormant in the mind of defendant for months subsequent thereto, and were only presented when a suit was brought upon a transaction distinct and separate from that out of which they grew. They do not fall within the category of fraud, mistake, or error, which the law allows to impeach a stated and settled account.

All the information relating to them was in the possession of the parties at the time when the settlement was made. The record is searched in vain for any new light which subsequent events threw upon them. We have already considered these claims. They rest—First. Upon the alleged failure to sell the cotton-seed meal promptly, and the loss caused by the delay. The testimony abundantly shows that the delay was due to the oil company itself, which persistently disregarded the advice of its agents, who urged the selling at an earlier day. Second. Upon the alleged neglect to enforce the contract for the sale "to arrive" of 2,000 barrels of oil in March, 1893. The testimony shows that it was the custom of the port of Rotterdam to allow buyers, under the circumstances proved, to examine the oil upon its arrival, and to reject it if it did not suit. Fisher, the representative of the oil company, who had opportunity to acquaint himself with all the facts, and who was examined at the trial, says nothing in contravention of all the testimony given on this point, and there is no proof that the oil company, after Fisher's arrival in Rotterdam, requested or required Hartog & Fesel to bring a suit to test the validity of this sale or otherwise sought redress for this grievance, and there is no ground for believing that it could have been legally enforced. The conduct of the oil company then and afterwards indicated acquiescence in the view of Hartog & Fesel that they were remediless in the premises, and it would be unconscionable now to hold them responsible for the omission at the time to take action which they were not required to take, and which, if taken, would not probably have been of advantage to the oil company. There is no proof that the oil subsequently sold was not disposed of to the best advantage; the greater part of it, in fact, having been sold during the time when Fisher was in Rotterdam. In our opinion, the account for consignments No. 2 and No. 3 was stated and

settled, and it was liable to impeachment only for fraud, error, or mistake. On this issue the burden was on the defendant below, and having failed to offer evidence relevant to that issue, and sufficient to support a verdict thereon in its favor, it was no error in the judge below to withhold from the jury the consideration of the counterclaims. The facts in this case differentiate it entirely from the case of Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, relied upon by the plaintiff in error to support the contention that it was not proper to withdraw the case from the jury. That was a suit by depositor against the bank which had paid certain checks forged by his confidential clerk, and entered the same in the plaintiff's passbook. The court held that, under the evidence, there was fair ground for controversy as to whether the officers of the bank exercised due caution before paying the altered checks, and whether the depositor omitted, to the injury of the bank, to do what ordinary care and prudence required of him. There being a mixed question of law and fact, a peremptory instruction to find for the plaintiff was held to be error.

This conclusion disposes of all the exceptions relating to consignments No. 2 and No. 3, and among them to the error assigned in the striking out of so much of the testimony of Fisher as states that he did not cable the oil company to draw the 10,600 marks "as a balance." As the oil company drew for it in terms "as a balance," and as the original message, which was in its possession, was the best evidence of its contents, and could have been produced if desired, no harm was done by striking out this expression; and especially so as it bore only upon that aspect of the case, which was subsequently withdrawn altogether from the consideration of the jury. There remains only the questions relating to the 1,000 barrels of oil shipped on the Grecian Prince, and known as consignment No. 4, upon which a balance was claimed by the plaintiffs below as due them under their advances of 60,000 florins. All the questions relating to this consignment, and as to the commissions claimed, were submitted to the jury in a charge which fairly and clearly presented all matters proper for their consideration. We find no error therein. The judgment of the court below is affirmed.