ALBANY,
October, 1835.

## GRIFFIN *vs.* POTTER.

Griffin
v.
Potter.

The legislature had the power to require persons entitled to the services of children born of *slaves*, to cause a record to be made of the ages of such children, and in default thereof, to reduce the term of servitude.

A strict compliance with the terms of the act in this particular must be shown, or the term of servitude will be reduced.

Where, however, the master omitted to comply with the requirements of the act, and the servant remained in the service of the master nearly three years after he was entitled to a release from servitude, and it appeared that the services of the servant had originally been purchased by the master at the request of the servant, *it was held* that the servant could not maintain an action against the master for his work and labor; there being no contract, either *express* or *implied*, to pay for such services.

ERROR from the Oneida common pleas. Potter sued Griffin for work, labor and services rendered by him. Potter is a negro; he was born 8th May, 1806, of a mother who was at the time of his birth a *slave*, and by the act for the *gradual abolition of slavery* in this state, passed 29th March, 1799, he owed service to the proprietor of his mother until he arrived to the age of *twenty-eight years*. In January, 1823, his services were sold to a person residing in *Buffalo*, and being unwilling to go with his master, he besought the defendant to buy him, telling him that he was to serve until he was 28 years old, and that if he would buy him he would be a faithful servant until that time. The defendant bought his services of his master, for which he paid $300, and Potter then went to live with the defendant, and continued with him until January, 1827, when he declared he would serve him no longer, and went away. The plaintiff contended that he was *born* a *freeman;* but if not, that he was *released* from his services *at the age of* 18, by the omission of the owner of his services in 1817 to deposit in due time, in the proper office, an affidavit of his name, age and sex, and of his own *name* and *addition*, in pursuance of the requirements of an act passed 31st March, 1817. (*See Session Laws of* 1817, *p.* 137, § 6.) The master of Potter, in January, 1818, deposited in the proper office an affidavit in these words: "I, Ebenezer Griffin, do depose and say,

that Jack, a negro boy now owned by me, is, according to the best information in my possession, thirteen years old or thereabouts;" and it was proved on the part of the defendant, that in 1817 and in 1818, Ebenezer Griffin lived in the town of Paris, in Oneida county, and was an attorney and counsellor at law. The counsel for the plaintiff objected that the affidavit was defective in not conforming to the requirements of the statute. The court ruled that the affidavit was defective, and that the defect was not cured by the parol proof. The defendant's counsel then insisted that the act of 1817 was unconstitutional as far forth as it assumed to forfeit then existing rights : the court pronounced the act valid and binding. The counsel next insisted that inasmuch as the defendant bought the services of the plaintiff at his request, and paid $300 for the same, that the payment of such sum to the former master of the plaintiff, ought to be considered as payment to the plaintiff, and a full compensation for any services rendered by him to the defendant. The court ruled that the payment made by the defendant to the former master of the plaintiff could not be allowed to reduce the amount which the jury should find the plaintiff entitled to recover. The court charged the jury in conformity to the above decisions, and left it to them to say what was the value of the services of the plaintiff after he attained the age of 18 years, deducting the value of the clothing furnished to him by the defendant. The jury found a verdict for the plaintiff for $170. The defendant having taken exceptions to the decisions of the court, and obtained a bill to be sealed, sued out a writ of error.

*J. Pond,* for plaintiff in error.

*S. P. Lyman,* for defendant in error.

*By the Court,* SAVAGE, Ch. J.    By the act for the gradual abolition of slavery, all children born of *slaves,* subsequent to 4th July, 1800, were declared to be *free,* but to continue servants to the owners of their mothers—*males* till the age of 28, and *females* till the age of 25. The act of 1817 made it the duty of the masters of such servants to give them certain

education before arriving at the age of 18, and in default of so doing, declaring the servants free at the age of 18; and in order that it might be known when the age was attained which discharged them from further servitude, the person entitled to such service was required, within one year after the passage of the act, or after the birth of the child of a slave, to make an affidavit stating the age of such servant; and in default of making and filing such affidavit within the the time specified, declaring the person so held to service free at 18. This statute required that the affidavit should contain " the name and addition" of the person making it, and " the name, age and sex" of the child. "And if such person shall neglect to deliver such affidavit to the said clerk within the said space of one year, then the child or servant concerning whose birth such affidavit shall have been so neglected to be delivered shall be released from his or her servitude at the age of 18 years, any thing in any former law notwithstanding; and every such servant so released shall be bound to service by the overseers of the poor, as is directed in and by the preceding section of this act." The affidavit is clearly not a compliance with the statute. It required " the name and addition" of the person making it to be contained in the affidavit. Did it stop there, we might perhaps say that the statute was directory merely, and that the affidavit might still be good : but the statute imposes as a penalty for a non-compliance with its directions, the forfeiture of the right to the service of the person thus held. The name and addition of the deponent are as much a component part of the requisitions of the statute, as " the name, age and sex of the child." The courts have no more power to dispense with one than the other; nor have they the power to receive parol testimony of the facts required by statute to be incorporated in the affidavit. Assuming for the present the binding force of the statute, the language of the legislature is, that unless such affidavit as is there prescribed shall be filed within one year, all claim to the services of the child shall cease at the age of 18. Suppose a perfect affidavit should be filed one day after the expiration of the year, it could be of no use; the claim is forfeited. The statute must be strictly complied with, or all rights under it fail.

It is contended that the statute assuming to divest a vested right is unauthorized, and void *pro tanto.* It is a fundamental principle of our government that all men are born free and equal, that is, entitled by nature to equal freedom and equal rights. The regulations of civil society have qualified the rights of different portions of society. The best interests in the whole, sometimes require that some shall be put under the guardianship and control of other. It is therefore by virtue of the arbitrary institutions of society, and by those alone, that one man has an interest in the services of another: property, strictly speaking, in the person of a human being cannot exist. A right in one man to the services of another may, and, in a qualified form, does exist in every well regulated society. The parent controls the services of his child, the guardian his ward, the master his apprentice. By what right, it may be asked? I answer, by authority of law—by force of the positive institutions of civil society. Is it not equally competent for the legislature to say that an apprentice shall serve till 28, as till 21? Cannot the legislature alter the paternal rights of a father, and give him the services of his child for the same period? The power of the legislature over this subject is sufficiently ample to justify any act which can come in question in this case. When our government was first instituted, one portion of the population was in bondage to the other. Slavery existed by virtue of the laws which were in force previous to our political existence as a state. It could be justified only by necessity. It was at war with our principles; and, as the legislature was of opinion that there was no necessity for its continuance, a law was passed to operate upon those thereafter to be born. This, I apprehend, was done in tenderness to the prejudices of those who were tenacious of what they termed vested rights. The legislature went further; as masters might complain that the services of the children, until twenty-five and twenty-eight, would not compensate for the trouble and expense of their support, the legislature authorized masters, who entertained such apprehensions, to abandon the children of their slaves at a certain period to the public, who agreed to take the same care of such children which they do of poor children, and at a suitable age to bind them

apprentices as poor children are bound. If the masters did not abandon such children, they were entitled to the service of males until the age of 28. It is true, therefore, that as the law stood before the act of 1817, E. Griffin was entitled to the services of the plaintiff until the age of 28. The legislature, however, were apprehensive that this class of our population were growing up in ignorance, and would not be qualified for the rational enjoyment of perfect freedom when they would be entitled to it, and required that they should be taught to read and write. Had they not power to make such a requisition of the master? surely they had, if they had any right to make regulations, having for their object the education of the whole society. There is no more interference with private rights, in making such a requisition of the master, than there is in requiring that poor children may be instructed at the expense of the more wealthy inhabitants of each school district. On an equally strong foundation does the power of the legislature rest, to require a record to be made of the age of each person bound to service. Without some document of that kind, it would be impossible in some cases to know the precise period when the right to service would cease. These were all mere civil regulations, which have no connection with the title to property, and were all under the supervision of the legislature. Should the legislature now declare that each master now claiming the services of an apprentice, should send him to school during a portion of each year, and on his neglect so to do, should forfeit his right to the services of such apprentice, I apprehend there could be no more doubt of their authority to make such a law, than there is that the existing laws on that subject are valid.

The next enquiry is, whether the plaintiff below can recover in consequence of his having requested the defendant to purchase his services, and represented that he was bound to service until 28. The case of *Livingston* v. *Ackeston*, 5 *Cowen*, 531, is relied on. It appeared in that case that Ackeston was born of parents who had been slaves, but were keeping house and acting for themselves before he was born. Livingston bought him, supposing him to be bound to service

ALBANY,
October, 1835.

Griffin
v.
Potter.

until 28. Ackeston supposed he was such servant, and procured another person to purchase his time from Livingston. Ackeston then sued *Livingston* for work, labor and services, and it was held that there was no assumpsit, either express or implied. This case is stronger than that. The defendant here, at the request of the plaintiff, bought his services, which he represented to be due until 28. A very large price was paid ; and there is reason to infer, that but for the request of the plaintiff, the defendant would not have made the purchase. If, under the circumstances of the case of *Livingston* v. *Ackeston,* there was no implied contract, surely the circumstances of this case repel any such implication. In that case, too, Ackeston was always free ; in this, it is clear that but for a clerical error in the affidavit of E. Griffin, the plaintiff would have been bound to serve until 28.

The court below seem to have considered the plaintiff as entitled to his wages after 18. According to the statute, he was free ; but if at 18 he had asserted his freedom, it would have been the duty of the overseers of the poor to have bound him as an apprentice until 21 ; and according to the usual rates of binding, he would perhaps not have been entitled to receive as much as he was permitted to recover. If he remained in the defendant's service after he knew he was not bound to remain there, and the defendant did not agree to pay for his services, there is no ground for an implied promise. If he had been entitled to recover, I doubt whether the true rule of damages was given to the jury.

Judgment reversed, and *venire de novo* from the Oneida common pleas.