## MONTGOMERY et al. v. ÆTNA LIFE INS. CO.

(Circuit Court of Appeals, Sixth Circuit.    October 3, 1899.)

### No. 639.

**1. WITNESSES—LIMITS OF CROSS-EXAMINATION.**

The right of cross-examination in courts of the United States is limited to facts and circumstances connected with the matter testified to upon the direct examination; the proper practice being, if it is desired to examine the witness as to other matters, for the party so desiring to call him as his own witness.

**2. EVIDENCE—PAROL TESTIMONY TO VARY WRITTEN CONTRACT.**

Where a written contract of employment as general agent for a life insurance company within a specified territory provided that the agent should receive as a part of his compensation a commission on the annual renewal premiums collected on existing policies within such territory, and the terms of the contract were full and unambiguous, parol evidence is not admissible to incorporate therein a collateral guaranty as to the amount of such renewal premiums.

**3. CONTRACT OF EMPLOYMENT — CONSTRUCTION — PRACTICAL CONSTRUCTION BY PARTIES.**

Defendant was employed as general agent of an insurance company within a certain territory, by a written contract, by which he agreed to devote his entire time to the service of the company, to conduct its business as directed, and was to receive as compensation stipulated commissions on the business done. For more than a year, and until his discharge, he rendered a monthly account as required, in which he credited himself with the commissions specified in the contract, and no more. *Held*, that the fact that he was directed by the company to designate himself on his stationery as "general manager," which he did, or that he performed some services as general manager different from those usually performed by a general agent, did not, under the circumstances and course of dealing, establish an implied promise on the part of the company to pay him for his services as general manager in addition to the commissions fixed by the contract.

**4. SAME—ADVANCES MADE BY AGENT.**

A contract of employment of a general agent for an insurance company obligated the agent to employ subagents in his territory, and provided that commissions allowed him on the business done should be in full compensation for his own services and those of his subagents. It also provided that the contract might be terminated at the option of either party, and that in case of its termination before five years the company should be under no obligation to pay the agent anything beyond the commissions earned up to the time of its termination. *Held* that, on the termination of the contract by the company within the five years, it could not be held liable to the agent for advances made by him to subagents, and which had never been charged by him to the company in his monthly reports.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is an action in assumpsit upon a bond executed by William B. Montgomery, as principal, and M. V. and R. A. Montgomery, as his sureties, to the Ætna Life Insurance Company. March 16, 1896, W. B. Montgomery was appointed the general agent for the Ætna Life Insurance Company for the territory included in the lower peninsula of the state of Michigan. The terms of the agency were prescribed by a written contract, duly signed and delivered, as follows:

"This agreement, made in the city of Hartford, state of Connecticut, this 16th day of March, A. D. 1896, between the Ætna Life Insurance Company, of said Hartford, party of the first part, and W. B. Montgomery, of Detroit, state of Michigan, party of the second part, witnesseth: That, in consideration of agreements hereinafter made by the party of the second part, the

97 F.—58

aforesaid Ætna Life Insurance Company hereby appoints and constitutes the party of the second part its general agent to procure applications for insurance for it in the counties in the state of Michigan lying south of Lake Michigan and Lake Huron, and to receive premiums upon all policies issued upon such applications, and to collect premiums upon renewals of the same, and also to collect renewal premiums on existing policies issued by said company in said territory. Said company is to allow and pay said party of the second part for his services, and the services of such agents as he may employ, commissions as follows: Seven per cent. of premiums paid and reported on single-payment policies. Forty-five per cent. of premiums paid and reported the first year on nonparticipating, renewable term policies, and upon other policies requiring less than twenty annual payments. Fifty per cent. of the premiums paid and reported the first year on other policies. Five per cent. of the premiums paid the second and subsequent years on all policies, including those existing in said territory and belonging to the Detroit agency. Said company also reserves the right to discontinue taking new insurance in the state of Michigan, should the legislation of said state, or the interpretation of existing laws respecting the business of insurance companies of other states, be deemed by said company prejudicial to its interests. Said company agrees to pay all physicians' fees, postage, exchange, and express charges on packages of agency supplies, also the taxes and license fees not higher than now required by state law; proper vouchers being given for all such expenses. Said company also agrees to furnish such stationery, blanks, and printed matter as it may consider necessary in the conduct of its business.

"This agreement further witnesseth that said party of the second part hereby accepts the agency of said company, and agrees to devote his entire time and energy to the business of said company, and to no other, and that he will not engage in or give any time to any other business whatever during the continuance of this agreement, and also employ a sufficient number of agents to canvass the territory named, and to see that the company is represented therein by efficient, active agents; that he will be responsible to said company for all premiums on policies and renewals sent him, or all papers and documents intrusted to him, and that he will account to said company on or before the tenth day of each month, or at any other time when required, for all premiums received by him or his agent, and remit the amount of same, less such charges as he is entitled to by this agreement; and that he will conduct the business in all respects in accordance with the instructions of the party of the first part. Said party of the second part further agrees to give a bond to said company for the sum of six thousand ($6,000) dollars, with good and satisfactory surety, and renew and increase the same as may be required. If the agreements herein made by the said party of the second part are not fully complied with, the agreement made by the party of the first part shall be wholly null and void. This agreement can be terminated by either party giving to the other not less than thirty days' notice. It is understood and agreed that, in consideration of the said party of the second part having received what is known by the company as a 'brokerage commission,' in case this agreement is terminated by either party hereto during the first five years from the date thereof the company shall be in no way obligated for the payment of any further consideration for the interest of said party of the second part in said business and agency. It is further understood and agreed that in case this contract is terminated by either party after five years from the date thereof, and none of the conditions thereof have been violated by the said party of the second part, the said company will pay to the said party of the second part an amount equal to five per cent. of the premiums becoming due the next year on all policies taken by said party of the second part and his agents after the date hereof, provided there is no agreement to pay or allow a renewal commission to any party on said business. In case there is an agreement to pay or allow to any party a renewal commission, there shall be deducted from the amount due said party of the second part, as herein provided, a pro rata sum on account of such agreement. The said company also agrees to add to the said five per cent. agreed upon to be paid in event of a termination of the agency after five years from date hereof, one per cent. for each full year the contract has been in force. That is to say, if the

agreement is terminated at the end of six years, six per cent.; seven years, seven per cent.; and so on up to ten years, after which there will be no increase; and the said party of the second part hereby agrees to accept the same as in full compensation for his then interest in the business and agency hereby conveyed. Said party of the second part further agrees that he will make no contract or contracts with subagents which cannot be terminated at any time at the pleasure of the company or by himself, and that he will not pay a renewal commission exceeding three per cent. to any subagent. It is understood and agreed that the agency books, records, and papers are the property of the company, and subject to its inspection and control at any and all times, and that the business and agency cannot be disposed of without the consent and approval of said party of the first part in writing. For two years from date hereof the said company will furnish said party of the second part with a suitable office for the proper conduct of the agency, of which it shall be the judge.

"This agreement is made in duplicate the day and date hereof.

"Ætna Life Insurance Company,

"By J. C. Webster, Vice President.

"William B. Montgomery.

"Witness:
     "T. B. Merrill.
     "T. B. Merrill."

In accordance with this contract of agency the bond in suit was executed, being as follows:

"Know all men by these presents, that we, William B. Montgomery, of Detroit, Wayne county, in the state of Michigan, as principal, and Martin V. Montgomery, of Lansing, Mich., Richard A. Montgomery, of Lansing, Mich., in the state of Michigan, as sureties, are holden and firmly bound to the Ætna Life Insurance Company of Hartford, in the state of Connecticut, its successors and assigns, in the penal sum of six thousand dollars ($6,000), for the payment of which sum we bind ourselves and each of us, our and each of our heirs, executors, and administrators, firmly by these presents. The condition of this obligation is such that whereas, the said Ætna Life Insurance Company had appointed the said William B. Montgomery its general agent for the following territory, viz. all that portion of the state of Michigan lying east of Lake Michigan and south of Lake Huron, which said territory may be enlarged or diminished from time to time, and the compensation for said agent's services changed, by agreement with him from time to time, neither affecting the obligation of this bond: Now, therefore, if he shall well and truly pay over to the said Ætna Life Insurance Company, or its order, all moneys which he shall receive for or belonging to it, reserving only such commissions and charges as he may be entitled to under and by virtue of the agreement existing, or which he may from time to time make with this company, and shall monthly, on or before the tenth day of the month, and at all other times when required by said company, render true and full accounts to said company of all dues, moneys, or property belonging to it in his hands or in the hands of his agents, or subject to his or his agents' control as long as he shall continue its general agent, and shall well and truly keep and perform all other acts and things by him to be kept and performed under and by virtue of the agreement now existing, or which he may from time to time make with said company, as aforesaid, then this obligation shall be void; otherwise, to remain in full force. And the sureties on this bond do hereby agree to waive notice of any fault the said principal may at any time make.

"Signed, sealed, and delivered this 21st day of March, A. D. 1896.

"William B. Montgomery.    [L. S.]

"Martin V. Montgomery.    [L. S.]

"Richard A. Montgomery.    [L. S.]"

August 10, 1897, this agency was terminated by notice given by the insurance company July 10, 1897. On that day W. B. Montgomery rendered an account of his receipts since date of his last monthly report, showing, after deducting commissions and expenses expressly provided for by the contract, a balance due the company of $6,462.09. The suit is upon the bond, to re-

cover the balance so due the company. The defense was a set-off aggregating a sum larger than the balance due from Montgomery as agent. This set-off was composed of the following items:

| | |
|---|---:|
| Shortage on commissions on renewals.............................. | $ 490 00 |
| Salary for services rendered in excess of the contract, at $150.00 per month............................................... | 2,520 00 |
| By clerk hire paid for seven months at $50 per month.......... | 350 00 |
| For money advanced to subagents............................... | 3,166 90 |
| | $6,526 90 |

Evidence offered in support of this defense was excluded upon objection by the defendant in error, and the jury instructed to return a verdict for the plaintiff in the sum of $6,000, being the full amount of the bond.

Fred A. Baker (Albert B. Hall, of counsel), for plaintiffs in error.
F. H. & G. L. Canfield, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and RICKS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

1. The first four assignments of error relate exclusively to the ruling of the court in respect to the limits of a cross-examination. A witness introduced and examined by the plaintiff to prove the mere formal parts of the plaintiff's case was cross-examined in respect to the subject-matter of the defendant's set-off, touching which he had not been examined in chief. Upon objection by the plaintiff, the court ruled that the cross-examination should be confined to matters covered by the examination in chief, and sustained an objection to a number of questions which related only to the subject-matter of the set-off. This was not error. The right of cross-examination in courts of the United States is limited to facts and circumstances connected with the matter testified to upon the original examination of the witness. If it is desired to examine the witness as to other matters, the proper practice is to call the witness as the witness of the party desiring to make such proof. Houghton v. Jones, 1 Wall. 702–706; Wills v. Russell, 100 U. S. 621–625.

2. The eighth, ninth, and fourteenth assignments of error relate to evidence offered to sustain the first item in the set-off, and may be considered together. That item, as stated in the amended detailed bill of particulars under the Michigan practice, was in these words:

"Under the contract under which William B. Montgomery entered the employ of the Ætna Life Insurance Company, said contract being dated March 16, 1896, he was to have 5 per cent. upon all annual premiums paid in on the second and subsequent years on all policies, 'including those existing in said territory belonging to the Detroit agency.' It was represented to said Montgomery at the time he entered into said contract that the renewals annually due on existing policies amounted to $54,000, but as a matter of fact they only amounted to $47,000, so that said Montgomery has not received, or lost, 5 per cent. on $7,000 from, to wit, March 16, 1896, to August 10, 1897, the sum of four hundred and ninety dollars ($490)."

To establish this item the plaintiff in error was asked as to what was said to him at Hartford, Conn., when this contract was signed by the vice president of the corporation in behalf of the corporation,

by either Mr. Webster, the vice president, or Mr. Merrill, the company's superintendent of agencies, in respect to the amount of business then standing upon the books of the Detroit agency, commonly called "renewals." He was also asked to state what was said to him at Detroit on either the 16th of March, 1886, when the contract was signed by the witness, or on the 17th of March, at Detroit, when the office and business of the agency was turned over to the witness by Merrill, the superintendent of agencies. The written agreement under which Montgomery became the general agent of the Ætna Life Insurance Company was full, clear, and specific, both as to his duties and powers, and as to how he was to be compensated for his services. By the specific terms of that agreement, the said company was "to allow and pay said party of the second part for his services, and the services of such agents as he may employ, commissions, as follows: Seven per cent. of premiums paid and reported on single-payment policies. Forty-five per cent. of premiums paid and reported the first year on nonparticipating, renewable term policies, and upon other policies requiring less than twenty annual payments. Fifty per cent. of the premiums paid and reported the first year on other policies. Five per cent. of the premiums paid the second and subsequent years on all policies, including those existing in said territory, and belonging to the Detroit agency." This covered the whole subject of compensation, and the aggregate of allowances constituted his entire compensation for his exclusive services to the company as its general agent. This agreement, though signed for the company at Hartford, where its general office was located, was not signed by or delivered to Montgomery until March 16, 1896, when the business was turned over to him at Detroit. It contains no representations or guaranty as to the amount of renewals payable at the Detroit agency. Whatever colloquies may have occurred between the parties prior to that time must be regarded as merged in the deliberate contract evidenced by the written engagement into which they have entered. The contract between the parties is particularly free from ambiguity in respect to any of its terms. The conclusive presumption is that the whole of the engagement, as the parties understood it, was reduced to writing, and that the absence of any provision in respect of the amount of renewals upon the books of the agency which Montgomery was about to take was in consequence of a determination that any statement occurring in the course of the negotiations in regard to such renewals should not amount to a guaranty or term or condition of the final engagement. Parol evidence was therefore not admissible to contradict, vary, or add to the terms of the written agreement, or to establish a collateral guaranty as to the amount of such renewals. Reid v. Glass Co., 54 U. S. App. 619, 29 C. C. A. 110, 85 Fed. 193; De Witt v. Berry, 134 U. S. 306, 10 Sup. Ct. 536; Seitz v. Machine Co., 141 U. S. 510, 12 Sup. Ct. 46; McAleer v. U. S., 150 U. S. 424, 14 Sup. Ct. 160. Montgomery did not sign this agreement for some days after it was signed for the company at Hartford. Every colloquium between Montgomery and the vice president, or Merrill, the superintendent of agencies, occurring either at Hartford or Detroit, prior to the time when the engagement went into

effect, is conclusively presumed to be merged in the written contract.

3. The next item in the set-off is for salary for services rendered in excess of the contract, at $150 per month, aggregating $2,520. The fifth, sixth, seventh, and eleventh assignments of error relate to evidence tending to establish this set-off, which was offered and excluded upon objection of plaintiff below. The evidence offered and excluded was intended to show that at the time the office and business of the agency was turned over to him at Detroit by Merrill, the superintendent of agencies, the latter instructed him to designate himself on all his stationery as "general manager," and that he had obeyed this direction. Montgomery also offered to prove that from that time he had not only discharged the duties of a general agent, but those of a general manager, and that the duties of a general manager include services which are not included within the duties of a general agent, and that he had performed the duties of such general manager, which were in excess of his duties under the written contract as general agent. There was no offer to prove any specific things done in consequence of this charge in the style of his office, but only an offer to prove that "the duties, among insurance men, of a manager of a state office," are different from those incident to the place of a "general agent." There was no offer to prove that any additional compensation was agreed to be paid, or that Montgomery ever at any time, until discharged from the services of the defendant in error, indicated any purpose to claim extra compensation for any possible extra services involved by this change in the designation and duties of his office. The right to recover for any extra service rendered by him must therefore depend wholly upon an implied contract to pay him, in addition to his compensation as general agent, the reasonable value of any additional services rendered by him as general manager. The excluded evidence, at most, only tended to establish that the designation of the position had been changed from that of "general agent" to that of "general manager," and that this change involved the rendition of certain services not incident to the place of a general agent. There was no offer to prove any agreement that Montgomery's compensation should be increased or in any way affected by the supposed imposition of duties not contemplated under the existing written contract. That contract obligated Montgomery "to devote his entire time and energy to the business of the company," and that he would not "engage in, nor give any time to, any other business whatever." The same contract required him to "conduct the business in all respects in accordance with the instructions" of the company. His compensation for this devotion of his "entire time and energy" to the business of the company was to consist in commissions upon premiums collected upon the business of the company within his territory. Under such circumstances, if the company should deem it advantageous that he should be designated as its "general manager" within the territory embraced within his general agency, would there arise by implication any contract to pay him additional compensation, even if this changed designation involved the rendition of services additional to those he was bound to render as its "general agent"? The general rule by which a promise

to pay for services is implied from the circumstances of the case does not assist the plaintiff in error; for an implied contract to pay for services rendered only arises when they are rendered "under circumstances authorizing an expectation of compensation therefor, or the inference that they would not otherwise have been rendered." McCarthy v. Mayor, etc., 96 N. Y. 1–8; Griffin v. Potter, 14 Wend. 209. Nothing is more evident than that Montgomery expected no extra compensation by reason of this change in the title of his position, even though it involved the rendition of some service which might not have devolved upon him otherwise. Month after month for a period of a year and a half he rendered his monthly account of premiums, and deducted therefrom the commissions allowed him according to the written contract, and made no claim for any other or additional compensation. The presentation of his claim only after he had been discharged is very cogent evidence that it was a mere afterthought. This rendition of monthly accounts, and deposit of the balance so shown due to the company, is in the nature of an account stated, which, though subject to impeachment for fraud or mistake, is prima facie evidence against the party rendering them of great weight. Oil Co. v. Van Etten, 107 U. S. 325, 1 Sup. Ct. 178; Wiggins v. Burkham, 10 Wall. 129; Pray v. U. S., 106 U. S. 594, 1 Sup. Ct. 483; McCarthy v. Mayor, etc., 96 N. Y. 1–8; Fertilizer Co. v. Hartog, 29 C. C. A. 56, 85 Fed. 150; Bartlett v. Railway Co., 82 Mich. 658, 46 N. W. 1034; Cicotte v. Wayne Co., 59 Mich. 509, 26 N. W. 686; Schurr v. Savigny, 85 Mich. 144, 48 N. W. 547; Sidway v. Commissioners, 120 Ill. 496, 11 N. E. 852. No evidence tending to rebut the implications arising from this course of dealing between the parties appears in the evidence received or that rejected. Without passing upon the question as to whether Merrill was authorized to make a new contract or vary that which had been made, or whether the evidence offered and rejected in respect to this item was technically admissible, we are of opinion that, if all the evidence excluded had been admitted, no case would have been made requiring the submission to a jury of the question as to whether there was an implied agreement to pay for the services which are the subject of the set-off now under consideration. The error in excluding the evidence, if error it was, was therefore harmless.

3. The next item in the set-off is for $3,166.90 advanced from time to time to agents. The detailed bill of particulars filed by the plaintiffs in error shows that these advances began in January, 1886, and were continued through each month until the termination of his contract. After proving that advances had been made to subagents, Montgomery was asked, as a witness, to state what his purpose was in making such advances. Objection was made to this evidence as incompetent. Thereupon there occurred the following colloquy between the court and counsel for plaintiffs in error:

"Mr. Baker: I want to prove the facts. I want to get the record in shape so that these legal questions can be considered together. And what I want to prove is that, in order to get efficient work from agents, it is necessary, advisable, and proper to make advances to them. Court: Is the right to employ them given by the contract? Mr. Baker: Yes, as we understand it. We desire to show under that contract that Mr. Montgomery employed a large num-

ber of subagents, and that he made advances to them in order to keep them at work, and that the time that they terminated this contract his advances amounted to $3,550. In addition to what the contract provided for, we will show that it is customary, in conducting the insurance business, for general state agents, like Mr. Montgomery, to make these advances; that it is usual in the business. We desire to show, in addition to that, the company, after the termination of the contract, got the benefit of that money, and realized on this very business that he started and built up for them, and insists upon having the earnings from it. And I desire to prove these advances were made with the knowledge of the company; that it is the usual course of business, and it is impossible for us to realize on them, and they are realizing on them. Court: I will have to exclude that. It is admitted, is it not, this account is substantially correct? Mr. Baker: They seek to recover upon his statements of the moneys he had received, and there is no doubt those accounts, as far as they go, are all right, but that is not all the case. There are these matters that arise because of the sudden and unexpected termination of the contract. Court: I am forced to take another view ‚ of that, I am sorry to say. I cannot interpret the contract as you do, and, if I understand your position correctly, that terminates your defense, under the rulings of the court? Mr. Baker: Of course, I offer to prove another item of clerk hire, which is covered by your honor's ruling in regard to the set-off. Court: Gentlemen of the jury, under the instruction of the court you will return a verdict in favor of the plaintiff for $6,000. Mr. Baker: I will note an exception to that instruction."

We cannot regard Mr. Baker's expression of a "wish to show" or "desire to prove" the matters stated by him as a proper mode of obtaining a ruling as to the competency or incompetency of the evidence he wished to make. Proper questions calculated to elicit the evidence desired should have been propounded, and, if objected to, a ruling thus obtained. This should have been followed with a distinct offer to prove specific facts, etc. This was not done. Waiving this, we are of opinion that there was no error in the ruling that under the contract such "advances" made by Montgomery to his agents were advances made at his own risk, and were wholly unauthorized by the contract. While the contract obligated Montgomery "to employ a sufficient number of agents to canvass the territory named, and to see that the company is represented therein by efficient, active agents," yet the same contract provided that the commissions allowed to Montgomery were "for his services and the services of such agents as he may employ." The moneys so advanced to these agents so employed by Montgomery were "advances"; that is, the sums so advanced were to be accounted for out of future commissions earned by them. It is too plain for discussion that the company was not responsible to Montgomery if he failed to recover such advances. The suggestion that the business thus built up would ultimately be beneficial to the company is of no force. The contract provides that, if the agency should terminate during the first five years, the company should be under no obligation to pay anything further to the agent than the commissions earned up to date of its termination. If it should continue longer than five years, the same agreement provides for certain payments to the agent upon its termination. The contract was terminated before five years, and, by the express terms of the contract, nothing was to be paid as a consequence of any interest in the business resulting from the labors or expenditures of the agent. But this item is subject to the same objections which applied

to the item for extra services; that is, the claim was never made until after the agent was discharged. The advances were made in small sums from month to month, and if they were made for the company, and out of its funds, and in expectation that credit would be given for them as legitimate expenses allowable under the contract, they should have been reported.

4. Section 7365, 3 How. Ann. St., provides as follows:

"If there be several defendants the demand set-off must be due to all of them, jointly, except where other provision is expressly made by law; provided, that in actions upon a note or other contract for the payment of money against several defendants, any one of whom is principal, and the others sureties therein, any claim upon contract in favor of the principal defendant, and against the plaintiff or any former holder of the note who transferred the same after due, or other contract, may be allowed as a set-off by the principal or any other defendant."

The court construed this statute as excluding the entire set-off of the defendants below, upon the ground that this was not an action "upon a note or other contract for the payment of money," but upon an indemnity bond, and that a set-off due to W. B. Montgomery, as the principal in the bond, was not a set-off due to all of the defendants, and therefore not a proper subject of set-off under the statutes of Michigan. We are not prepared to agree with the learned judge in this construction, though we find it unnecessary to decide the question. Irrespective of the ruling in this regard, the instruction to find for the plaintiff below was correct, for the reasons we have already stated. The error, if it be one, in also basing that instruction upon the inadmissibility of any set-off due to W. B. Montgomery, was harmless. The last item in the set-off account stands upon a somewhat different ground. That item is for $350, clerk hire paid by Montgomery "at the special request of the plaintiff," according to the amended bill of particulars. This bill of particulars shows that this sum was paid out in monthly installments of $50 each month for a period of seven months. At the conclusion of the colloquium between the court and Mr. Baker, counsel for defendants below, touching his offer to make certain proof in respect to the item for advances to agents, which has been set out above, Mr. Baker said, "Of course, I offer to prove another item of clerk hire, which is covered by your honor's ruling in respect to the set-off." To this the court seems to have made no direct reply. No other reference to this item of the set-off occurs in the bill of exceptions. The error assigned is the fifteenth, and is founded upon the general ruling that a set-off due to one of the defendants only was inadmissible. Treating this item as excluded wholly upon the ground that the set-off was due only to W. B. Montgomery, the ruling was harmless. The recovery was only for $6,000, the full amount of the bond. The balance due from W. B. Montgomery, if credited by this item of $350, was not less than $6,100. No harm, therefore, resulted; for the judgment was for no more than was recoverable, if this item had been allowed as a credit. The result, upon the whole case, is that no harmful error occurred in respect to any part of the defense, and the judgment is therefore affirmed.