## ÆOLIAN CO. v. STANDARD MUSIC ROLL CO. et al.

(Circuit Court, D. New Jersey. February 18, 1910.)

1. **WITNESSES** (§ 268*) — CROSS-EXAMINATION — EQUITY SUITS IN FEDERAL COURTS.

   The rule laid down in Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521 which interprets equity rule 67, requiring all testimony offered to be taken regardless of objection to its competency, materiality, or relevancy, has no application to the question of the proper scope of cross-examination.

   [Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 268.*]

2. **WITNESSES** (§ 269*)—CROSS-EXAMINATION—SCOPE.

   Cross-examination must be confined to the subjects of the direct examination, and, if the cross-examiner desires to examine as to other matters, the proper practice is to make the witness his own, at the proper time in presenting his own case.

   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 949–954; Dec. Dig. § 269.*]

3. **WITNESSES** (§ 268*)—CROSS-EXAMINATION—SCOPE.

   A cross-examiner, by asking of the witness questions not within the proper scope of cross-examination, cannot make the testimony thus elicited the basis for further and still more extended cross-examination.

   [Ed. Note.—For other cases, see Witnesses, Dec. Dig. § 268.*]

In Equity. Suit by the Æolian Company against the Standard Music Roll Company and G. Howlett Davis. On motion to compel witness to answer certain questions. Denied.

Louis M. Sanders, for the motion.
Gifford & Bull, opposed.

RELLSTAB, District Judge. The unanswered questions, 50 in number, were asked of the complainant's witness Joseph Francis Meade, on cross-examination. This witness was called for the purpose of proving the record of sales made by the complainant of an instrument called the "metrostyle" and a statement of the aggregate of sales tabulated therefrom.

The examination in chief of this witness covers less than 4 typewritten pages, embracing but 18 questions, and relates entirely to his identity, business relationship to the complainant, his knowledge and custody of such sales record, the making of such tabulated statement, the method of such tabulation, and the territory covered by such sales.

His testimony, other than that which directly relates to such record, was but introductory and to lay a foundation for the offering of such record. At the time the cross-examination was interrupted for the purpose of pressing this motion, the cross-examiner had asked 390 questions, covering 84 typewritten pages. The unanswered questions, which form the basis of this motion, are as follows:

"XQ. 61. Are you able to state what the relations of the Æolian Company are with a certain other corporation, known as the Æolian, Weber Piano & Pianola Company?"

"XQ. 65. Are you willing to state whether or not you know of any relations existing between the Æolian Company, on the one hand, and the Æolian, Weber Piano & Pianola Company, on the other?

"XQ. 66. As assistant treasurer of the Æolian Company, do your duties require you to record any transactions between the Æolian Company, on the one hand, and the Æolian, Weber Piano & Pianola Company on the other?"

"XQ. 77. What is the name of the other company that owns the Universal Music Company?"

"XQ. 79. Is not the Æolian Company also a subsidiary company owned by the same company, which owns the Universal Music Company?"

"XQ. 93. Are the accounts of any other firm or corporation, either kept or supervised by you?"

"XQ. 96. Are you chief clerk in the accounting department of any other firm or corporation than the Æolian Company?"

"XQ. 113. Do the accounts of the Weber Piano Company come in your department?"

"XQ. 118. Is your only reason for declining to answer because complainant's counsel has instructed you not to?"

"XQ. 127. What is the business of the Weber Piano Company, and where is the plant of that company located?"

"XQ. 187. In your answers to Q. 1, XQ. 125, XQ. 130, you have stated that you are assistant secretary of several different companies, secretary of others, and assistant treasurer of still others. Please state whether or not these companies are in any way connected together, either by business relations or as subsidiary companies to a single holding company."

"XQ. 191. And is that other company the Æolian, Weber Piano & Pianola Company?"

"XQ. 197. Who is the owner in fact of the stock of the Universal Music Company?"

"XQ. 200. There was introduced in evidence in connection with the deposition of one of complainant's witnesses an exhibit which comprised the Piano and Organ Purchasers' Guide for 1908. On page 121 of said exhibit, I find a paragraph under the heading 'The Æolian Company.' I ask you to read said paragraph, and then state whether or not the statements set up in said paragraph are true in fact."

"XQ. 204. According to your books of account, as chief accountant for the Æolian Company, is there a surplus in the treasury of the Æolian Company or represented by assets, over $2,000,000?"

"XQ. 207. You have stated that the Universal Music Company was entirely independent of the Æolian Company, but that the stock of the Universal Music Company is all owned by another company, to which said Universal Music Company is subsidiary. Is any of the stock of the Æolian Company owned or controlled by that other company, and is the Æolian Company also subsidiary to that other company to which the Universal Music Company is subsidiary?"

"XQ. 210. What is the name of that other company to which the Universal Music Company is subsidiary?

"XQ. 211. Is it not a fact that the Æolian Company is controlled by the Æolian, Weber Piano & Pianola Company, which has a capital of $10,000,000?"

"XQ. 223. What is the Æolian, Weber Piano & Pianola Company?"

"XQ. 227. Was not the Æolian, Weber Piano & Pianola Company formed to own and control the companies named in your answers to Q. 1, XQ. 125, XQ. 130, and XQ. 215?"

"XQ. 231. I call your attention to a statement occurring on page 121 of defendant's Exhibit No. 10, Piano & Organ Purchasers' Guide for 1908, said statement occurring in the article entitled 'Æolian Company,' and reading in part as follows: 'This concern is controlled by the Æolian, Weber Piano & Pianola Company'— and ask you to state whether or not that is true."

"XQ. 234. I find in defendant's Exhibit No. 10, Piano & Organ Purchasers' Guide for 1908, a statement to the effect that in 1903 the Wheelock Piano Company was absorbed by the Æolian, Weber Piano & Pianola Company, of which company you have stated you are the chief accountant. Is that correct?"

"XQ. 236. What is the nature of the entries which you so supervised.

"XQ. 237. Do you also supervise the reports or the entry of reports made by other companies to the Æolian, Weber Piano & Pianola Company?

"XQ. 238. Please state whether or not you are in possession of knowledge or information that would enable you to make correct answer to such of the questions put to you on cross-examination as you have been instructed by counsel for complainant not to answer?"

"XQ. 243. When it was organized to become a subsidiary company to the Æolian, Weber Piano & Pianola Company, were you immediately appointed as its chief accountant?"

"XQ. 272. What portion of the business of each of these companies is transacted at their several offices at 362 Fifth avenue, New York?"

"XQ. 302. Then if you had no knowledge of the factory operations of these two companies and should see a label bearing the inscription 'Manufactured by the Universal Music Company,' you would be deceived, would you not, into the belief that such music roll was manufactured by the Universal Music Company?"

"XQ. 306. And if such roll were not in fact manufactured by the Universal Music Company, although it bore the label of that company, you would be deceived, would you not?"

"XQ. 311. If in fact it should prove that such roll was not manufactured by that particular manufacturer, would you not be deceived into purchasing that which you did not desire to purchase?"

"XQ. 329. Did any of these persons—that is, H. B. Tremaine, C. M. Tremaine, E. R. Perkins, and E. S. Votey—own in their right any stock in the Universal Music Company on the 7th day of June, 1909?

"XQ. 330. You have stated that the Universal Music Company is owned by another company. Do you mean by that that that other company is the owner of all of the stock of the Universal Music Company?"

"XQ. 335. Have you ever voted in opposition to the policies dictated by the four persons whom you have mentioned?

"XQ. 336. Do the three persons you have mentioned as dictating the policies of the Æolian Company and with C. M. Tremaine dictate the policy of the Universal Music Company ever dictate a policy for either of these companies which is not in perfect harmony with the policy of the other company?

"XQ. 337. Is it not a fact that the business policy of one of these companies is always in perfect harmony with the business policy of the other company?

"XQ. 338. Do you deny that there is any inharmony between the business policy of the Æolian Company and the Universal Music Company?"

"XQ. 342. So that the policies of these several companies are made to harmonize with each other by being formulated by these four persons, are they?

"XQ. 343. As chief accountant of the Æolian, Weber Piano & Pianola Company, do you have any accounts to enter other than the account of that company, with the companies mentioned in your answers to Q. 1, XQ. 125, XQ. 130, XQ. 215?"

"XQ. 354. Are they all independent of the Æolian, Weber Piano & Pianola Company?"

"XQ. 357. Have you knowledge of the facts which would enable you to make correct answers to each of the questions which have been put to you and which you have refused to answer under instructions of counsel for complainant?"

"XQ. 389. And these relations are all governed by the Æolian, Weber Piano & Pianola Company, are they not?"

"XQ. 393. Defendant's Exhibit No. 10, Piano & Organ Purchasers' Guide for 1908, contains a description of the Æolian Company. Please read that descrip-

tion as found on page 121, and state whether or not that description is correct in all respects."

"XQ. 395. Do you deny that the statements contained in the article found on page 121, under the title 'Æolian Company,' were true at the date of the publication of this exhibit, namely, in 1908?"

"XQ. 398. In 1908 did it have a surplus of $2,000,000?"

"XQ. 402. I again show you defendant's Exhibit No. 10, and call your attention to an article at the top of page 237 of the exhibit, and ask you if the Æolian Company referred to in said article is the same Æolian Company which is the complainant in this suit."

"XQ. 403. Do you deny that the Æolian Company referred to in this article last referred to is the same Æolian Company which is the complainant in this suit?"

"XQ. 407. So that there is a relation existing between the Æolian, Weber Piano & Pianola Company and the Æolian Company, complainant herein, which relation you could fully describe but for the instructions which have been given you by counsel for complainant; is that correct?"

"XQ. 409. In the answer of complainant's witness Davis to Q. 273, the witness makes the statement that the Æolian, Weber Piano & Pianola Company was formed to own and control the following manufacturing and operating companies: Æolian Company, the Weber Piano Company, George Steck & Co., the Wheelock Piano Company, the Stuyvesant Piano Company, the Vocalion Organ Company, the Votey Organ Company, the Orchestrelle Company of Great Britain, the Choralion Company of New Jersey, and the Orchard Land Company. Is this statement of complainant's witness Davis correct?"

"XQ. 410. Are you in possession of information that would enable you to corroborate the statement of the witness Davis as found in his answer to Q. 273?"

"XQ. 411. XQ. 632 in the deposition of complainant's witness Davis and the answer thereto reads as follows: 'In the second paragraph of the quotation from your speech as made in answer to XQ. 627, occurs the following: "The Æolian Company is a $10,000,000 concern." Is the "Æolian Company" here quoted in this extract the complainant company herein? A. It is, or rather the complainant company is one of the ten companies forming the "$10,000,000 concern." I have named the other nine companies in my previous answers.' Please state whether or not the statements of the witness Davis as contained in his answer to XQ. 632, and particularly that portion of his answer as included after the fourth word ('rather'), is true?"

The principle that controls this motion relates to the right of cross-examination, and not to whether the testimony sought to be elicited is material to the issue. Bleese v. Garlington, 92 U. S. 1, 23 L. Ed. 521, relied upon by the defendants, therefore, is not applicable. In that case, a judicial interpretation was given of that part of the sixty-seventh equity rule which directs the taking of testimony regardless of objection being interposed as to its competency, materiality, or relevancy.

As was said by Judge Ward in Æolian Co. v. Simpson-Crawford Co. (C. C.) 157 Fed. 320:

"The purpose of the rule laid down in Bleese v. Garlington was to bring before the court on appeal all the testimony offered, so that the case might be finally disposed of there without the necessity of sending it back for testimony improperly excluded below. When the objection is to the relevancy and materiality, the testimony excluded will never get into the record if the ruling is adhered to; but in this case the objection is that the defendant is injecting his defense into plaintiff's prima facie case. At the proper stage in the action all testimony in support of the defenses will be admitted."

In Bleese v. Garlington, no judicial consideration was given as to the proper scope of cross-examination. That question was not involved. Equity rule 67 does not attempt to change the practice in

that respect. On the contrary, it expressly provides that the examination, cross-examination, and re-examination shall be conducted as near as may be in the mode now used in common-law courts.

On the argument, in response to the court's question, counsel for the defendants referred to the first answer of the witness as authorizing such a line of cross-examination. The question to which this answer was given is as follows: "Q. 1. Please state your name, age, residence, and occupation?" And the answer, after giving the name and residence, is as follows: "Assistant treasurer of the Æolian Company."

Such questions and answers mark the beginning of all properly conducted examinations, and, if they can be made the basis for cross-examinations such as is here sought to be enforced, then, even the primary rules for the taking of testimony, founded in reason, and justified by centuries of experience, are of no avail. In his brief, counsel for the defendants seeks to justify this line of cross-examination in the following language:

"Complainant, having made certain charges in its bill of complaint, and having endeavored to support those charges by the testimony of three witnesses, has disclosed certain irregular practices which has led the defendant company into the belief that the complainant company has been guilty of unfair and deceptive practices in its own trade. In order to lay before the court for its consideration what those practices have been and are, defendant has put certain questions to the witness, and it is believed that complainant should not be permitted by its counsel to close the mouth of that witness against the disclosure of such facts when the witness is in a position to have and has knowledge of all the facts."

This but begs the question raised on this motion. With defendants' right to show that the complainant has been guilty of deceptive practices in the trade, the court is not now concerned. This they may do under equity rule 67, whether the Circuit Court deems it competent or not; but they must do it in accordance with the established rules regulating the introduction of evidence. A party offering a witness stands sponsor for his credibility, and, stated generally, is bound by what he may say both on direct and cross examination. Being so bound, he has the right to call him for a particular purpose, and his adversary has no right to examine him generally, but is confined to the subjects testified to by him in chief. The cross-examiner will not be unduly restricted in the examination. Full scope and opportunity will be afforded, for cross-examination is the best-known method for the ascertainment of truth; but it must be confined to the subjects of the direct examination. If it is desired to examine the witness as to other matters, the proper practice is to make him his own witness. The only exception to this rule is to show bias or prejudice and to lay the foundation to admit evidence of prior contradictory statements. Wills v. Russell, 100 U. S. 621, 25 L. Ed. 607; Montgomery v. Ætna Life Ins. Co., 97 Fed. 913, 38 C. C. A. 553; Thomson-Houston Elect. Co. v. H. W. Johns Mfg. Co. (C. C.) 105 Fed. 249; Resurrection Gold Min. Co. v. Fortune Gold Min. Co., 129 Fed. 668, 64 C. C. A. 180; Æolian Co. v. Simpson-Crawford Co., supra.

In his supplemental brief defendants' counsel contends that inasmuch as the witness in answering XQ. 125, 130, and 215, has shown that he is an officer of other companies, he may be cross-examined by

him to show a hidden connection and illegal alliance between them for the purpose of deceiving the trade; but the cross-examiner, by leading the witness into fields not touched upon in his examination in chief, cannot make the testimony thus elicited the basis for other and more extended cross-examination. The test of a proper cross-examination is always: Was the subject dealt with on the direct? and not whether the witness referred to it in the cross. Otherwise the party who called him might be bound by the testimony given during a cross-examination upon subjects concerning which he had not testified on his examination in chief. Resurrection Gold Min. Co. v. Fortune Gold Min. Co., supra.

In furtherance of this contention, defendants' counsel insists that this witness' answers to XQ. 125, 130, and 215, are to be considered as a part of his answer to Q. 1; but this is manifestly an error. This is not the case of cross-examination revealing that part of a conversation or transaction to which the witness testified on his direct examination, but which he then failed to disclose. The answer of this witness to question 1 regarding his occupation was complete as far as it related to the subject-matter for the introduction of which the foundation was then being laid.

On cross-examination the showing that the witness held other positions could not be said to be improper; but the fact that he held other positions in no way lessens the completeness of his former answer, so far as the introduction of the record of sales was concerned. Such record was not in the custody of such witness as the holder of any of such other positions, and the tabulated statement derived therefrom was made by him or under his direction as the officer of the complainant. His answer to that question, if it should be considered as anything more than introductory, was complete on direct examination.

The defendants may not introduce the character of testimony which is sought by such unanswered questions on the cross-examination of this witness. If they desire such testimony from him, they must call him when their turn for taking testimony arrives.

In my judgment, this attempt to force such testimony into the record as a part of the complainant's case is a flagrant abuse of the right of cross-examination, and is not to receive judicial sanction.

The motion is denied.